The International Human Rights Advocate and photojournalist, Huwad Al-Akbarab, once said, quote, every country needs its whistleblowers. They are crucial to a healthy society. The employee who, in the public interest, has the independence of judgment and the personal courage to challenge malpractice or illegality is a kind of public hero. My name is David Rothstein and it is my honor to represent the appellant Dr. Summer Lashley in this matter. Dr. Lashley embodies the type of person that Mr. Al-Akbarab was describing in his commentary about whistleblowers. Dr. Lashley began her teaching career, this was her first job after getting her PhD in criminal justice, at the Spartanburg Methodist College, a small at the time of a two-year institution in Spartanburg, South Carolina. She started in July of 2017 as the director of the SMC criminal justice program and as a professor of criminal justice. She quickly learned that because of her position in criminal justice, students at SMC would frequently come to her about instances of injustice, bullying, sexual assaults, and other misconduct within the school. Most of the incidents that Dr. Lashley complained about involved instances of sexual misconduct, bullying, and frankly criminal behavior by student athletes at SMC, primarily against female students. She also noticed efforts by coaches and the administration at SMC to silence such advocated for them to administration, encouraged them to pursue Title IX remedies, and tried to ensure that these matters were handled appropriately. Her actions ended up costing her her job at SMC and have placed an indelible stain on her young career in academia that might never be erased. This is an appeal from the district court's granting of summary judgment for dependence on all of Dr. Lashley's federal clauses of action. On this appeal, as a preliminary matter, we argue that the magistrate judge and the district judge failed to address plaintiff's motion for sanctions against defendants based on spoliation of evidence and refusal to produce electronic information such as text messages, email messages, and surveillance videos during discovery, which information we had sought from the very beginning of the case. This was not a Rule 56B issue, as the college intends, where we were trying to get additional time for discovery. This is about defendants' deliberate efforts to withhold or bury relevant evidence as reflected in the depositions for which the magistrate judge specifically extended the discovery deadline to allow a 15th. It was an abuse of discretion for the judges below simply to disregard this important motion before taking out the summary judgment motion on the federal claim. As the court knows under Rule 37, one of the remedies for spoliation of evidence or failure to produce evidence during discovery is it allows an adverse inference to be taken against the party who failed to conduct discovery in good faith. We believe that this was, again, an abuse of discretion for the judge, both the district court judge and the magistrate judge, not to address that issue, and that was raised as our first objection to the magistrate judge's report and recommendation. Judge Dawson, who at the time was still a fairly new district court judge, didn't even grant a hearing on either of the motions, the motion for summary judgment, or the objections that the appellant raised. With respect to the merits of the appeal, the district court's grant of summary judgment is reviewed de novo. As the court is well familiar, on a motion for summary judgment, all facts and inferences in the record have to be taken against the non-moving party. Here, Dr. Lashley. First of all, on the issue of causation, which was one of the elements of the prima facie case in both the ADA discrimination claim and the Title VII, I'm sorry, the Title IX retaliation claim, the district court disregarded this court's well-established holding that short temporal proximity between the protected activity and the adverse employment action, and alone to create a effect for the jury on causation. In Jacobs v. North Carolina Administrative Office of the Courts, this court clearly held, quote, close temporal proximity is sufficient to establish a disputed issue of fact as to the causation element of the prima facie case. This holding was more recently confirmed in the Sempovich case. Defendant Gibbs, who was at the time the individual defendant in the case, plainly stated in his deposition that the decision not to renew Dr. Lashley's contract was, quote, the complaints, the complaining continued. That produced direct evidence of causation between Dr. Lashley's protected activity under Title IX and the ADA and the decision not to renew her contract. Now, President Cochran, who is also an individual defendant in this case, acknowledged that he later, that he revoked his promise to continue Dr. Lashley's pay and benefits throughout the term of her original contract after he received my letter of representation threatening legal action against the school and indicating that we were pursuing possible, investigating possible claims under the ADA and Title IX. This is important because it's retaliatory animus on the part of Defendant Cochran. Defendant Cochran also refused to allow Dr. Lashley's request for a grievance to be pursued. He also refused to follow the Title IX or the request for a Title IX investigation into Dr. Lashley's termination. And later, the Board of SMC refused to process Dr. Lashley's complaint under the Faculty Manual Employee Handbook, which has a specific whistleblower provision in it. Those also show retaliatory motive, motivation on the part of the college. Again, this is, this Dr. Lashley's Title IX activity was under the opposition part of Title IX, not the participation clause. As defendants incorrectly argued that there had to be a formal Title IX Office of Civil Rights complaint by the Department of Education before she had protection under that statute. Actually, that's under the Supreme Court precedent that recognized retaliation for cause of action under Title IX. We believe that the district court's decisions or the district court's analysis on causation was erroneous as a matter of law and should be reversed under the de novo standard. Perhaps the most glaring error in this case was the district court's accepting of the Crawford alleged non-retaliatory, legitimate non-retaliatory reasons for the adverse employment action. Dean Gibbs, Defendant Gibbs stated that Dr. Lashley was quote, not a good fit for the school. This is by its own nature cannot be a legitimate non-discriminatory matter. You have to look beyond good fit. Why was Dr. Lashley not a good fit in the eyes of SMC? Again, Dr. Gibbs's deposition testimony was that she was not renewed because of the complaining. The complaints continued. If the district court's decision on summer judgment is allowed to stand, any employer could avoid liability for a termination by simply stating the employee in question was quote, not a good fit. This is an amorphous subjective statement that really is incapable of being challenged. The district court also erred in using the obsolete pretext plus standard where he articulated that not only must Dr. Lashley disprove the sort of legitimate non-discriminatory reason by the employer, but she also has to produce additional evidence that discrimination was also was the motivating but for causation for the termination. Again, that pretext plus standard, the court cited to an unpublished decision that cited back to the Reeves versus Sanderson plumbing supply case with the South United States Supreme Court rejected the pretext plus standard and said that evidence of pretext combined with the primate facing case is enough to survive summary judgment. This is not an issue of Dr. Lashley's job performance as defendants that incorrectly argue in their brief. The only person who ever evaluated Dr. Lashley's teaching performance was a woman named Mary Jane Farmer who was Dr. Lashley's immediate supervisor and was the head of the social sciences department at SMC. She testified that Dr. Lashley knew her stuff, that she was that the student evaluations for the first semester were outstanding, and she also placed her on the preliminary schedule for the 2018-2019 school year and was supposed she was supposed to teach five classes both the fall and the spring. This is not a question of job performance. That the latest issue of the preliminary schedule I saw was was dated February 14th, the day after Dr. Lashley was notified that she would not be removed. We also have claims under the Americans with Disabilities Act for failure to accommodate her disabilities and for unlawful health inquiry. Defendant's position which was again erroneously adopted by the district court was that Dr. Lashley's failure to return a form that the college used for reasonable accommodation requests within eight days precluded her failure to accommodate to accommodate claim. That case or that holding is not consistent with the interactive good faith process that's required for accommodating employees. What about the emails using very coarse language that displayed an utter contempt for SMC faculty and staff that she just had. She had issues with faculty, administration, students, and staff. Didn't seem like she could get along with anyone, and one thing that concerned me was there supposed to be a degree of professionalism in the relationship between teachers and students. Yes, there's a close relationship and many teachers are mentors to many students, but here it seems to me that the professionalism had broken down. They were playing favorites that people were just congregating. Her room was a town hall, but there were two concerns I had here that didn't seem to me to relate to discrimination. One was just the breakdown of professionalism that was documented in various emails and the rest, and the other was the total contempt expressed in foul language for everything about the institution of which she was supposed to be a part. And when someone says they're not a good fit, what you're saying is I think what the person that says you're not a good fit is recognizing that in any institution and in this world, to get something done requires a degree of teamwork and requires getting along with other people. And she just didn't seem to get along with almost anyone. And for that kind of problem, I don't see why someone could say it's not a good fit if you hold everything about the institution with contempt. And as I say, you have to get along with people in any institution to get anything accomplished. And the record here indicated some genuine problems in that regard. I have three points to make on that, Your Honor. Number one, the text messages that were I'll say excerpted or bridged by the defendants or annotated by the defendants were not known at the time the adverse employment decisions were taken. At best, this would be after required evidence. And as Your Honor knows, after required evidence does not absolve the employer of liability. It just limits damages from the date the did the employer, anybody on behalf of the employer know of her threat to blow the place up and of her said that somebody was going to get killed. Those were passed on by the colleague that was in the same room as her. But Your Honor, the important thing to note here is my question is, was that information? That's when they fired her, right? So the alleged threat occurred on Valentine's Day, February 14th, the same day as the school shooting down in Parkland. That's the threat that somebody's going to wind up dead? No, no. Well, again, Dr. Lashley denies making those statements. The alleged threat that she said she was going to blow up the school or something about an explosive. February 14th? That was on February 14th. The conversation she had with Dr. Kiesler on the 15th is where she supposedly said, you know, people who cross me wind up dead or something like that. But again, she denied ever making those statements. I understand, but just setting that aside, I just wanted my question was, was that information that was passed on to the administration, right? That was passed on to the administration on the morning of Friday, the 16th. And that's the reason they, instead of having her finish the year, they fired her right on the spot, right? That's what Dr. or Mr. Cochran, the president of the college said. I know, but you were responding to Judge Wilkinson's question about emails after recovered. I thought these things were known by the administration. The text message, I think you're complaining two things. The text messages that Judge Wilkinson's referring to were produced in discovery well over a year into the case. And again, these were things that the defense lawyers taken out of context. No one was questioned about the context of the text messages. And again, at best, that's a after acquired evidence issue. You know, I think that the defendants have taken extreme liberties in how they characterize these text messages. I'll be the first to acknowledge there's a lot of unprofessional commentary in the text message. So these two incidents that I just raised are of the same ilk that Judge Wilkinson raised. It's basically, she's totally fed up with the place. Well, again, I think if you look at the, let's take the statements one at a time. The first statement was the allegation that Ms. Turner overheard her say something to the students that she felt like blowing up the school. Ms. Turner didn't report that immediately. She left for the day. She came back later that the next day at a board luncheon and saw Mr. Gibbs or Dr. Gibbs. Dr. Gibbs denies that ever happened. But the commentary she made in her first written statement said, I don't think there's anything to this, but I felt like I needed to bring it to somebody's attention. Again. Counselor, you have some, you've gone over, but you have some time for rebuttal. Do you think you might save this for rebuttal? Yes, I'll reserve my time. Thank you. Thank you. Mr. Flippen. Thank you. May it please the court. My name is Todd Russell Flippen and I represent LEs in this case, Spartanburg Methodist College. It's President Scott Cochran, Dr. Mark Gibbs, Marisa Ferguson, Dr. Jonathan Kiesler, Angelina Turner, and Cleveland Boyd. Thank you for allowing me to be here today in front of you. The court should affirm the district court's ruling as to all of the federal claims drawn appeal. Dr. Lashley simply could not, proper evidence that could overcome defendants, the legitimate non-discriminatory and non-retaliatory reasons for all of its adverse employment actions, including the decision not to review her contract, but also the termination that's already been mentioned on the 16th of February, 2018. Moreover, the court directly declined to rule on that motion for sanctions. Was February 15th the day she was terminated? She was terminated on the 16th, your honor. On the 16th. At the time they made the decision to terminate her, did anyone involved in that decision know of these alleged threats? Yes, your honor. The two threats that Judge DeMark referred to? Absolutely, your honor. In fact, Scott Cochran, who's the college president, takes full responsibility for the decision to fire Lashley on the 16th. On the 13th was the first incident that was with Mark Gibbs. After she was told she would not have a contract for the following year, she reacted against Dr. Gibbs out in the hallway. There's no dispute that the interaction took place. There's no dispute about the words that were said. You can go back and look at plaintiff's Department of Employment and Workforce testimony where she describes how she told Dr. Gibbs, I thought you were my father figure. How could you turn on me? The only dispute between their two testimonies goes towards the tone of the conversation. Nevertheless, Dr. Gibbs was very impacted by that interaction. There's no contest then on the 14th, Dr. Lashley was having a conversation with a group of students in the presence of Defendant Angelia Turner, who is the one who in turn reported that she believed she heard Summer Lashley say she felt like blowing the place up. Now, as has already alluded to, Angelia Turner- What was the second communication? That would have been the same communication that is on the 15th. In the morning of the 15th, Summer Lashley went to Jonathan Kiesler's office. They didn't really have a pre-existing relationship at school. They're in different departments. Nevertheless, he was nearby. He spoke with her. She was describing the fact that she felt really like she was done wrong by reason of not having her contract renewed. He prayed with her and then she made comments which have been reported in the record that people that cross me wind up dead. My dad says it's true and that Scott Cochran and Mark Gibbs are evil and that they will get theirs. Those are comments that- Did Cochran know of both comments? He did, yes. One was on the 14th. That's the blowing up the school. Yes. The 13th was the interaction with Mark Gibbs out in the hallway where- I think the judge's question was not just the two. Blowing up the school and people going to end up dead. You've added to it the one on the 13th, but to get it straight, she supposedly made the statement that she felt like blowing up the school on the 14th of February. That's Valentine's Day. Her friend pointed it out. On the 15th, people cross me and end up dead. Yes. And 16th, she was terminated. That is correct. She was terminated because of those comments reported in Scott Cochran. And not just one, but the combination of the two, although Scott Cochran did testify that either one of those comments alone would have been sufficient. Understanding that, of course, the 14th was also the day of the Parkland school shooting down in Florida. So these things were on their minds. And adding to that, there's record evidence that Scott Cochran is a survivor of a workplace shooting incident, in which case he lost, I think, nine colleagues, narrowly avoided losing his own life. So the impression on Scott Cochran was immediate, and he took immediate action. And he has never apologized for that. He believes very strongly that the reports he had were significant and sufficient to terminate Summer Lashley immediately, which really brings this case. Well, the question is whether his decision was motivated by something protected conduct. Yes, Your Honor. And in fact, in making that analysis, the pretext to H.S. now, Spartanburg Methodist College has given these legitimate non-discriminatory reasons for why Scott Cochran fired her. The question really becomes whether, what is the probative value, what are proof that Summer Lashley offered in opposition to that evidence, and offered for you that there is no probative value of the evidence she offers in opposition is nil. It cannot surmount the legitimate non-discriminatory reasons and well-documented reasons and consistent reasons given by Spartanburg Methodist College. So a few things to state for sure. Scott Cochran, the termination decision was made by him and him alone. So any attribution of knowledge to Jenny Dunn, whether it be about ADA complaints or any thought that Mark Gibbs would have knowledge of her disability, those were not the decision makers for the termination decision. Only Scott Cochran made that decision. He did not know of any reasonable accommodation request. And though he knew of the mold claim, which has been alluded to in the briefs, the plaintiff has disclaimed that the mold issue, which she had stolen a maintenance worker, exacerbated her asthma back in January of 2018, was not a request for reasonable accommodation. So, you know, the plaintiff seeks to portray herself as a valiant whistleblower, and goodness knows we ought to protect whistleblowers because they uncover a lot of whistleblowers. But there are many, many cases where people have been whistleblowers, but they've done it without abusive and contemptuous conduct and words. And there are ways to fault institutions. No institution is perfect, and there are ways to draw attention to institutional shortcomings. There are ways to be a whistleblower. But the record here shows unremitting contempt of a place that she's working, continuing problems with students, faculty, staff, and a breakdown in professional bonds between professors and students. And this doesn't seem to me to be discrimination and what that's going on. We can go through it claim by claim under the ADA and Title VII and all the rest, but they all bottom out on the fact that sometimes you just need to be a member of a team in a basically civil way. You can get a lot more accomplished in terms of what you think your goals are when you work with other people rather than trying to steamroll them, hold them in contempt, abuse them, and the like. And that's my problem when you look at this record as a whole. It wasn't a good fit. It was a horrible fit. And that's not discrimination. To your point, Your Honor, to say a good fit was really just a shorthand way of saying those things which Mark Gibbs spoke about in his affidavit immediately after the termination, also spoke about in his deposition and in the affidavit filed for this motion for summary judgment. Those reasons have never changed. They've always been the same. And one thing that was not addressed is it wasn't just Dr. Gibbs that made the decision not to renew the contract. It was also Dr. Anita Bowles, who actually was Mark Gibbs' superior. There's no evidence whatsoever about what her state of mind was or whether she had discriminatory intent, and she was an equal decision maker with Mark Gibbs in that function. Going back to the bad fit, though, in his affidavit, multiple things come to mind. One, student complaints of favoritism. And earlier, there was some critique that we had used text messages in this litigation. I would point the court to the fact that in the record, plaintiff did answer our request to admit, admitting that all the text messages we've used are legitimate, they're from her cell phone, and there's no question as to their authenticity. Well, I think his point is that some of the emails were not known by the decision makers when the decisions were made. That is absolutely true, Your Honor. We've never said otherwise. In fact, all these text messages do is they give us basically a live stream. Well, they don't have any relevance to the decision. No, they had no relevance to the decisions made at SMC at the time. But what they do provide is they help us test the probative value of plaintiff's testimony or evidence offered in opposition to our non-palliatory, non-discriminatory, legitimate reasons for the adverse actions taken against her. If she says, I was a good fit, I wanted tenure, I wanted to stay longer. Well, that is tested against the fact that at the time, we had this stream of text messages, vitriol against her co-workers. Council complains that these were taken out of context, but to say that your boss is an a-hole doesn't need context. It kind of completes itself in terms of the phrase. So the use of the text messages... But they didn't know that when the decision was made. Sorry? That was not known when the decision was made. That was not. However, there was plenty that was known, and this goes to the good fit argument, including the interaction... That's what you need to argument. That's what you need to point out, though, is what was known. Sure. And that was a solid decision. Right. It's your position. Decision was proper. Going back, starting in August of 2017, which is the very beginning of Lashley's employment at SMC, Mark Gibbs knew right away she had problems with students and faculty. There were complaints. These are the complaints he refers to, not Title IX reports. So, one in particular is very early, and plaintiff first learned that she was getting the job. She saw there's a website. She said, hey, please use this picture for your website. Very excited. She sends a picture. Lisa Ware, who was one of the staff members at SMC, got the picture. Said, hey, would you like to be... Can we interview you for a publication? And so a reporter came and interviewed Dr. Lashley. She was very excited. Shared the news link with her friends. And then something changed, and Dr. Lashley comes back and says, I want all of those newspaper articles retracted. And Lisa Ware, who at the time was doing public relations work for the school, says, I can't go and ask a publication to retract an article after it's been printed. One basic question, we can look at what's for the decision maker and all this. But how is this discrimination? I mean, where are the comparators here? Where are they treated women less favorably than they've treated men? How is there an ADA failure to accommodate when there's no record evidence about what accommodation, what the disability was, or what the accommodation was expected or requested? How is this a Title VII complaint when there's no... A Title IX complaint when there's no formal complaint with DOE or EEOC, and there's no relationship to gender? How is she treated differently from male employees? How are male employees given preferable treatments to her? I don't see how this is discrimination. You can agree with a decision, or you can disagree with a decision, but how is it discriminatory? To your point, there are no comparators in this case. Plaintiff has never identified anyone who had a similar situation and had a different outcome. What you would expect in this type of case is someone to point and say, here's a male employee that has made similarly contemptuous remarks, but the contract was renewed. Here's a male employee that exhibited the same sort of or same shortcomings, but they were accommodated, or they were kept on, or the contract was renewed. The stronger cases for discrimination point out, have a comparative analysis. Discriminate means you treat people differently depending on because of a prohibited characteristic. Where is that in this case? It is not, your honor. The affidavit of Dr. Gibbs clearly establishes all the things that make up that phrase, not a good fit. The plaintiff agreed. There's no dispute. If you look at her text messages, that she at the time did not want to be at SMC anymore. She had applications out. She told her colleagues that she wanted to get out of SMC. That is not in doubt. Moving forward though, the plaintiff's counsel brought up a pretext standard, which I think is a bit of a attempt at distraction. Whether the district court did quote this court in Cole versus Family Dollar, that's a 2020 decision, and though it does in fact cite cases that are in this line of cases that Reeves described as a pretext plus standard, the fact is that the holding is much more nuanced than that. That's why the real issue here in terms of plaintiff's response to the pretext at the pretext phase is a probative value of her evidence. The probative value of evidence is nil. Counsel, you only get into pretext if it's a pretext for discrimination. It's not a pretext for discrimination. They've given the same story throughout. The story hasn't waffled around. They haven't been inconsistent or vagrant in their explanations from beginning to end. What they're saying is this situation is not working out, and it is draining the morale and the group efforts to go forward in many different respects. So if it's a pretext for discrimination, that's one thing, but you have to have discrimination. Absolutely. There's no discrimination on this record at all. It's all based on plaintiff's inability to work in an academic collegial environment with colleagues without running into conflict with seemingly all of them. So I want to leap forward to Title IX claim because I think it's important to distinguish. Plaintiff on appeal says, hey, you know, the adverse employment actions which resulted because of or motivated by retaliation based on her Title IX reports was Scott Cochran's failure to afford her grievance procedure, SMC's failure to process her whistleblower claim, and then this idea that Scott didn't pay her what he promised to pay her. I'm going to address this very briefly. First off, the grievance claim has no founding because she had no entitlement to grieve termination as a non-tenured faculty. That's clear in SMC's policymaking. So there was no entitlement to grieve. Nevertheless, she was offered a neutral three-member panel to hear agreements on her behalf, and she declined. Also, the whistleblower complaint, plaintiff never engaged in the Thus, for her to have a whistleblower retaliation claim, the policy required that she at first actually made a report as a whistleblower. That never happened. All she did was email SMC's HR director at two occasions back in 2017 that students had told her about incidents that she believed needed reporting, and she should have reported those because she's a responsible party, and if she does hear such things, it's good that she reports them. She was never chastised or I do want to address Scott Cochran's temporary decision to rescind the promise to pay balance of her contract. This comes about because she was terminated on 2016. She was terminated at that moment. SMC no longer had any employment obligation under the contract that they had signed in 2017. However, Scott Cochran, I think just reasons of goodwill, offered to pay the balance of her contract. So, she was fired at that point. She had to leave campus immediately. After plaintiff sent a letter from her attorney that she was going to file, seeking to file litigation against the school, Scott Cochran temporarily rescinded that decision, but there's no evidence otherwise than that SMC fully paid up the contract, paid for all the benefits she would have been entitled to had the contract lasted through the entire duration. In fact, they pay off amounts prior to when they would have been due had she continued under her contract. And this would be a real stretch here to find that retaliation includes not only some sort of employment activity, but a unilateral promise to pay, which under contract law is not a contract. There's no obligation for Scott Cochran to, other than his reputation, to fulfill that promise to pay the balance of Scott Cochran's one-year contract. So, it would be a reach to find that the range of adverse employment actions includes a post-termination independent contract. All right. Thank you. Thank you very much, counsel. Mr. Rothstein, you have some rebuttal time. Judge Wilkinson, to your point about the discrimination, this is not a disparate treatment claim. We withdrew our disparate treatment claim. Originally, we went to the EEOC on a disparate treatment claim with a professor named Dale Heider, who's a retired cop. I thought you still have, under the ADA, discrimination. We do, but it's not. That's discrimination. The discrimination of the ADA is the failure to accommodate her disability. Well, you have a separate account for failure to accommodate, but you also have ADA discrimination claims. Well, part of it is the failure to accommodate her disability. And then there's the ADA retaliation. Those are two different things, right? They are, but failure to accommodate is a form of discrimination. But we're not saying that she was treated differently. I gather you're not making any claim that there was a discrimination under the ADA? I think it's clear that failure to accommodate a disability is a discrimination. It's not a disparate treatment case. It's a failure to accommodate a disability. The other thing I want to make clear is that these alleged accommodations, it's not clear what accommodations she wanted. There was no record evidence of disability in many cases. And there was accommodations that were offered, such as removing the mold in her office. She rejected them. Judge, you're conflating the issue with the mold and the disability. So the way this played out, Dr. Lashley made a complaint to a low-level maintenance person that there's mold in her building, and she's seeing a pulmonologist the following week to have her, you know, to be checked out or whatever. That low-level person emailed his supervisor. The supervisor emailed the president of the college, the provost, and the dean of faculty about an issue with mold. And the dean of faculty said, oh my God, here we go again. And two days later, he confronted Dr. Lashley and said, tell me about your health issues. She felt pressure to tell him that she had PTSD from being a stalking victim, that she had... Why wouldn't that just an inquiry about she had complained that that affected her asthma, that the mold there, and they repaired it. And so somebody comes down and says, well, what's your health problem, which is the mold problem, right? But that's not... That's not asking what is... You say you've got some breathing problems because of the mold. So why didn't she just say that the problem is I have mold here? Well, that was one of the problems. At the time, she was having uncontrolled diarrhea. You're not listening to me. I'm saying you interpreted the question when somebody comes and asks you, what is your health problem? You treated that as sort of a HIPAA question or something. Give me your medical history. And that isn't really what he was reaching. He was trying to find out what was causing her health problem, health issues. Well, but to say that that's a job-related and consistent with business necessity to have this literally could not be any broader than what are your health issues? That's not... I understand you may have... So he suggested moving her to a different building. But she turned that down. Right. But three days later, she requested an accommodation form because she was having uncontrollable diarrhea. She was on the third floor of the building. There was no restroom on the third floor. And so she contacted Jenny Dunn, the HR person, and Jenny Dunn sent her the form. She... Dr. Lashley apparently mistakenly... Why didn't she fill it out? Wasn't that complex? She was sick, and she thought that she had to have that reviewed or filled out by a doctor. She had an appointment with the doctor. She called Dr. Lashley. That's not what the form said. I understand that, but that's what... And she's a professor. She's a PhD, right? She gets this form. It's a single page. Tell me about it so we can address it. Yeah. But two days later, she told Dr. Dunn that they thought she had Crohn's disease. I mean, everybody I think knows that Crohn's disease requires being close to a bathroom. You're again not addressing the question. The question is why didn't she return that form? She didn't have time to return the form. Your answer is that she thought she had to get a doctor. Right. Well, that's what the record shows is that she... She didn't return the form. There's no dispute. She didn't return the form. Now, what about you were going to say something about the threats? The threats are highly contested. So the first threat that was made... They're contested. But they were made the two days before the termination. But Dr. Lashley... What's the officer supposed to do in this? Well, first of all, again, this is a good faith belief on Dr. Mr. Collins. You can't have a professor of criminal justice threaten to kill people or blow places. She didn't make those threats. That's what the record... If you view the record in the light most favorable to her, she denies ever making any type of threat. That's irrelevant. It's irrelevant whether she made them. Those threats were communicated to the president. And the president... Just a minute. Let me finish. Those threats were communicated to the president and the president took his action based on those threats. If he was wrong, he was wrong. But it was not based on discrimination. He has to have a good faith belief that those... Why? This is not a breach of contact case. This is a third hand account of these reports. Fair enough. It could have been totally false. But he's the president and he hears about a teacher who's threatening to blow up the place and that retaliates that they'll be killed. And it's in the context of his knowledge about shootings and killings. And he fires her based on that. Okay. Now let's say that's a mistake. What cause of action do you have for that? Well, I mean, it has to be good faith belief. He can't... Why? That's what the law requires. So what law? If you... The case law says that... What law? There's a case law that says that it has to be a good faith belief that what the report is, is true. Just a minute. He fired her from a position based on false evidence that he believed was true. Right. What cause of action does she have for that firing? Well, he has to have a good... She has a breach of contract at best. Well, we do have a breach of contract. We don't have that here. We do. The judges remanded the state law claims or sent the state law claims back. Breach of contract, we have... We're looking at the 388 claims and a Title IX. Right. I understand that. Okay. So now let's address that and let's keep... Sir, you'll have to let me just finish my sentence. What we have before us is an 88 claim and a Title IX. And you argue that summary judgment cannot be granted because the president received false information that he believed was true. But he has to reasonably believe... He has to be a good faith... That's what the case law says. Under what case law? He made a good faith decision to fire her because he thought there was a risk. Now, it turns out that the risk was false. It doesn't mean that he violated her rights under the ADA. Our theory is that they were looking for a reason to get rid of her. In the same conversation that Dr. Gibbs came in and said, tell me about your health issues. He also said, and rumor has it that you've told this student who had about a honey mustard dumped on her in the cafeteria to get a lawyer. That's a protected Title IX activity. I mean, if she advised... And he was upset about that. So again, our theory is that they made up the whole story about the threats. Again, if this were a true threat... Who made it up? Ms. Turner made it up and Dr. Kiesler made it up. So the two got together in a back room and agreed to make up these things? I don't know how exactly... You've got the burden. I understand that, but... You're alleging conspiracy. But there were... If you look at Ms. Turner's statement, she said that she wasn't part of this conversation. She said she overheard a conversation that Dr. Lashley was having with a group of students out on the hallway. And you say that's false? That's false. And one of the students submitted an affidavit that said there was never such a thing. But she passed it on. But she didn't pass it on until the following day. She thought it might... She didn't think it was anything, but she thought it might be. Of course, by the time it gets to the president, it's backed up by a statement from another person that says that somebody could end up dead. And again, Dr. Lashley, that's a he said, she said thing that can't be decided on summary judgment. Again, there was no... All right. Thank you, counsel. Thank you very much. We've given you some extra time. And I'm sure the panel would like to come down and shake everyone's hands, and then we'll take a five-minute recess and counsel our cases. All right. We'll conference our cases right here. We'll come down and greet counsel, as is our custom, and we're happy to...
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King